We have a busy morning, and we will start with Mr. Bashman. Good morning, Your Honors, and may it please the Court. My name is Howard Bashman. I represent Objector Appellants Van Enterprises, and I'll be addressing the settlement and class certification issues. May I reserve five minutes for rebuttal? Yes. Thank you, Your Honors. There are three reasons why the District Court's class certification should be vacated. The first is that the District Court applied an impermissible double standard and thereby committed an error of law by applying a less rigorous predominance inquiry for a settlement class than it would have to apply for a litigation class. But there are differences between the two, are there not? There are differences between a litigation class and a settlement class, absolutely, if that's what you meant by the two. My second point, and I'd be happy to come back and spend a lot more time on that first point, is that the District Court did not have the benefit of this Court's recent rulings in the hydrogen peroxide case or the Danvers against Ford case, two cases that, in our view, may be fatal to class certification. And our third point, Your Honors, is that on the record in this case, even applying the correct standards that this Court has very recently laid out, it's impossible to uphold these class certifications. Just to give a couple of factual highlights from the record, the defendant's expert – the class certification motion was fully briefed before the settlements were entered into, and the defendants in opposing class certification brought forth expert declarations, including from the dean of the University of Chicago School of Business, who gave the opinion that 40 percent of all customers benefited from the use of contingent commissions. And there were other numerous factual disputes and expert disputes. There's no common impact under the Boghossian case due to the 40 percent who benefited. And under Fraud and RICO, as the defendant's opposition showed, there was no uniform scripted deception here. These were all individual contracts entered into between various numerous entities. And so even if this Court were to apply the correct legal standards, it's just impossible on this record to affirm. Let me ask you this question because I'm confused, and maybe you can help me out. I understand your argument that the allocation may be improper and that perhaps subclasses should have been imposed in this case. I'm having trouble understanding your other arguments because if you are correct, that means no class can be certified or a very, very limited class will be certified in this case. And your clients, I don't think, would be able to fall under it. So you would get no recovery at all. Am I correct in that? My client, the client who I directly represent, was an insured who purchased insurance from Zurich using, at a relevant time, Gallagher. And so we don't agree that we would not be able to recover more if the class were properly arranged in a way that excluded. Well, that's allocation. That's not your standing argument. Some of your other strong arguments that seem to indicate that no class could be certified at all here. We understand that one possible consequence of our argument may very well be that under this Court's current law, no class could be certified, and that is a risk that we have willingly undertaken, for better or worse, because we don't like the current settlement in terms of what we get out of it. And so, Your Honors, So nothing is better than something, I gather. Well, we don't think that we're going to get nothing because if we have to go back to the drawing board here, we think that it is possible to get a settlement that will have no objections whatsoever. I mean, one of the settlements has only one objector right now, and that's the Gallagher settlement, and that objector is my client. But there's another proceeding that's going to be argued after you're finished as well, which may have some effect on a remand. Right, and we'll be watching that with interest, as I'm sure Will, Gallagher, and Zurich. If we affirm that, wouldn't you be out in the cold? We have not studied that question closely, but we agree that if the trial court was correct in dismissing the complaints, then we would probably be out in the cold. But what we're here for today in objecting to these settlements is trying to get a settlement that gives us what we deserve, not a settlement that gives us less than what we deserve. How many people do you represent in this appeal? I believe that there are more than a dozen, but maybe fewer than 20 objectors to the Zurich settlement, and I represent the only objector to the Gallagher settlement as well. If your clients opted out, why couldn't you just do that and then proceed with their own case? We addressed that point in one of our reply briefs, Judge Greenberg, and the reason that we did not opt out is set forth there, which is that we had concern about statute of limitations issues and also thought that it was more advantageous for us to come in and try to improve the settlements from our perspective. Those same problems continue to exist if you have statute of limitations problems and no class is certified, that same statute of limitations problem staring you in the face. We understand that, Judge Fischer, and I think that, again, my client came into this with his eyes open, understanding that if the settlement is set aside, there will either be a different settlement that may be better, which is what we're hoping for, that perhaps the worst-case scenario is all these claims are out of court, and that would not be as good as what we have now, but what we have now is unacceptable. Mr. Bashman, let me go back to one of your very initial comments. Have we ever said that the district court has to utilize the same rigorous standard when looking at certification for settlement as they do for certifying for litigation? Have we ever specifically said that? This court? Yes. Well, first of all, the Amchem case, Justice Ginsburg for the Supreme Court says that, and then this court has said that in the Prudential case, which came out after Amchem, and so I believe the answer to your question is yes, but, again, it's something of a loaded question because I think everyone concedes that the manageability inquiry does not apply in a settlement class action. So the same standard, it's not the same standard. It's everything except for manageability, but it is the same standard and perhaps even a more rigorous standard with regard to the predominance inquiry. Now, you answered something in one of your pleadings that you were part of, a sort of contrition for the not appearing at the hearing. Right. And the attorney did not appear at the hearing. He's in the room, so he's hearing your comments now. Well, wasn't that a bit of a sandbagging of the district court to not have been there and to not have vigorously advanced your certification issues that you're doing here? I don't believe that that was the intent of it. I guess whether it was or wasn't, isn't that some form of waiver to be able to come back to this court after the district court went through the process and assert the argument, as you're asserting here both in your papers and today? Certainly a waiver argument is being raised in the Zurich appeal by appellees, and it's not based on the failing to appear at the argument. The district court set out when it gave notice of the settlement the opportunity to object in writing, which was the requirement in order to have an objection. You had to send it in writing, and that my client did. It also offered the opportunity to anyone that wanted to appear in person at the hearing to appear in person at the hearing. And when I asked the person who didn't go to the hearing, you know, why didn't you go to the hearing? Because believe me, that's not a fact that I like about this case myself. That person told me that he made a mistake in calendaring the hearing, which is what we explain in our reply brief. That's not a good mistake. I mean, I'm here today. If I wasn't here today, I wouldn't expect the court to take pity on me. If he wanted to be there and to assert that, shouldn't he have filed something in the district court when he discovered the mistake to try to reopen the class certification and the settlement? Well, the court had in front of it the written objections. I know they did. I understand the written objections are one thing. Right. I would posit that the vigor with which you advance those written objections may have some implications on the extent to which the district court fully placed on the record all of the Rule 23 analysis. Well, it certainly should not, because the district court has an independence obligation that this court has recognized, even in a case where there's no objectors whatsoever, to protect the rights of the absent class members. And so, Your Honor, I understand the court's concern, and I hopefully have answered that as best as I can. But the facts remain here that we have a written objection. Through that written objection, we adopted the objections of the defendants to the class certification. And what the trial court did was, in essence, say that's, to use a term, that where there's a settlement, you can have what's called a drive-by class certification, which is if the pleading of the plaintiff says that class certification is appropriate, which, of course, we have competent class counsel, so it did, and you have a settling defendant who says that we want to settle, that that's enough, and we're not going to get in there and grapple with the actual dispute that is presented, which is what the error was. I'd like to come back to the plan of allocation. Yes. Because you make a strong point that subclasses should have been provided in that instance, and that really, I guess you're saying that there's a conflict between what you term were three different groupings. That's precisely correct. Could you elaborate on that? Because I think I want to hear from your opponents on this particular issue as well. Absolutely. The three components that divided the proceeds of the Zurich settlement were excess claimants who received the bulk of it, slightly more than 57 percent, and those are excess claimants from a period of 2001 to 2004. A little bit less than 34 percent of the settlement proceeds went to non-excess insurance purchasers for the period 1994 to 2005, and then the remaining little bit less than 10 percent went to what are called the conspiracy claimants under the theory that somehow. The umbrella. Right, correct. And what our argument is, Your Honor, is that the way that the district court came upon this allocation was simply based upon the advocacy of the attorney general group. And their expert. Right, and experts, which was the other category that I was going to be putting up next. And, in fact, it was the attorney general coalition that was advocating in favor of essentially the excess claimants. So it's not surprising that that group would have benefited the greatest as a result of proceeding in that manner. And what our point is, Chief Judge Sirica, is that under this court's case law, such as Warfarin, where the court said that's where you have a situation where the class members are going to be recovering less than 100 percent, this court was essentially indicted there saying that while it may have been appropriate, it may have been okay in this case not to have had separate representations for subclasses, that in a case such as the case that brings us here today where there's not going to be total recovery among claimants and where the claimants do have conflicting interests, that it would be necessary to have separate representation appointed. So we do believe strongly that the allocation is flawed, and that's what should happen on remand if the case is sent back at a minimum, is that the trial court should appoint separate representation for these subclasses. So I hope I've spoken to your issues there. Did you have an expert report that challenged the Attorney General's experts? I don't believe that we did on that, Your Honor. And if not, is there some sort of a failure of proof here on the part of the objectors? I think that the reason there's not a failure of proof is that the record itself displays the conflict glaringly, and that what is needed here is not further battle of the experts, but in fact the way that in our system of law results are achieved for clients is by having adequate representation for competing interests. And so what Your Honor is suggesting, now that I've had a moment to think about it, is that one objector should essentially bear the burden of advocating through expert testimony on behalf of approximately the bulk of the class. And what we're suggesting is that the disparate interest between these groups was so obvious that if the direct purchasers, the non-excess purchasers, had separate representation, then there would have been adequate resources and the ability to come in with appropriate evidence showing what they were entitled to, as opposed to just making it the responsibility of one objector to bear that burden. I had a feeling that I might not use all of my time, but I do appreciate the Court's generosity in giving time. So if there are no further questions. Thank you, Mr. Basham. Thank you very much. Thank you. Good morning. Good morning. May it please the Court, my name is John Pence, attorney for appellants IADO Inc. and Zorkes LLC. And I will be speaking on the topic of attorney's fees today. The most salient fact with regard to the fees requested and awarded in this case is that the complaint against Zurich was filed in August of 2005 and the memorandum of understanding in which Zurich agreed to pay $100 million to settle the case was signed just two months later in October of 2005. This case was never litigated. There was zero risk, or if there was any risk, it lasted no more than two months. And there was no complexity. This case is just like Send and Prize in that it was a prepackaged settlement and was unlike all of the other cases that will be argued later in that Zurich never resisted it, never fought it. There were no motions filed. There was no discovery. The amount that Zurich agreed to pay, well, I should say that after October of 2005, the task that class counsel needed to perform with respect to the Zurich settlement included confirmatory discovery, drafting the actual settlement documents, and also negotiating their own attorney's fees. The amount that Zurich agreed to pay to class counsel in fees is exactly equivalent to the amount that Zurich demanded that the class give up to help fund the three-state settlement, which, by the way, again, was primarily for the benefit of the excess policyholders and not the non-excess policyholders that class counsel claimed were their primary clients in the MOU. This is territory that the New York Attorney General occupied first. Class counsel knew that they had to have a different angle on this or they weren't going to get any money out of it. So in their MOU, they demonstrated their consciousness that they needed to distinguish their efforts from the efforts of the Attorney General by laying claim to the excess policyholders. They later retreated from that position, but I would urge the court to look at that original MOU and what was intended. With regard to class counsel's insistence that the class is not paying this fee, I simply would contend that that is simply not credible. The fact that class counsel's fee, $30 million, is exactly the amount that Zurich demanded they give up to fund another settlement, keeping the total at $100 million, I do not think that's coincidental. Furthermore, with regard to the possibility that $29 million could spill back into the settlement, the $29 million was just a guaranteed floor in the three-state settlement. There is simply no evidence that the minimum has been triggered or will be triggered. At the very least, I think the district court should have requested evidence on that issue and perhaps delayed the fee award until we got an answer on that. If the $29 million spills back in here and goes, at least part of it goes, to the non-excess policyholders, then perhaps there is an additional benefit. But what we have right now, as far as we know, is a $70 million settlement, and a $30 million fee on a $70 million settlement is simply excessive. It's a 43 percent fee. Furthermore, with regard to the lower objections, do your objections challenge the, let me use the word guardedly, the complicity of that $29 million payment to the three-state settlement, or do you strictly challenge the reasonableness of the fee as it's being paid, as it was awarded by the court? I don't think I can challenge the complicity or collusion without further discovery into the process by which it was proposed. You just made that allegation today. It was not part of your objection, per se. Well, I believe that in the objection that my client filed below, I did point out the exact correlation between the amount given up and the fee. In any event, once it was paid out to the three-state settlement, unless it comes back, it really shouldn't be considered value added here. I also pointed out in my brief that this was the easiest for $100 million of a $210 million settlement. And, you know, the fact that Zurich was willing to enter into this MOU within two months of the case being filed shows that they certainly were aware that they were going to have to pay at least that much, and certainly a lot more to put all of this litigation and the AG actions behind them. But the district court's biggest mistake here, and it really dwarfs everything else, is that the court gave class counsel credit for their entire lodestar in this entire case up to that point. And contrary to what the district court held, it would be very easy in this case to segregate out the Zurich time from the litigated case time because the tasks that were performed in connection with the Zurich settlement were qualitatively different. They were confirmatory discovery, not actual litigated discovery. They were drafting settlement documents, not drafting motions or oppositions to the other defendant's motions to dismiss. If you separated that out, what would that make the lodestar multiplier, do you know? No, and that can't be calculated because the court didn't require time records to be filed. But my projection would be no more than $4 or $5 million just based on, well, even taking a rough division of the settlement among the 25 defendants, that's what you would come out with. I believe I said in my brief it would come out to $6 million. But I think it probably would be no more than $4 or $5 million, which means the fee awarded is an excessive lodestar multiplier, not justified by the risk undertaken in this case. And I believe if the court went back, it's not like Hensley and Eckerhart where the Supreme Court stated where it is difficult to divide hours on a claim-by-claim basis. That's not the case here because the tasks, as I said, that were being performed with respect to Zurich were qualitatively different. The court used the July 3106 date for the cutoff for lodestar. In fact, while citing to a case that said it is improper to, let me see, in footnote 3 at page 4 of the fee memo, the court said that it is improper to include litigation time post-settlement in a lodestar analysis. But the court set the cutoff date at July 31st instead of the date of the MOU, October of 2005. Certainly, based on what the district court held, it would be improper to apply a multiplier to time incurred post the date of the MOU. I think the court simply misapplied the case it was citing at that point. So based on my projection or guess that the Zurich lodestar would be between $4 and $5 million, I think a reasonable fee in this case would be no more than $15 million, which would be a multiplier of three, which would be very generous given the low risk assumed in this case of a duration of two months. If class counsel had demanded a fee of only $15 million, I believe the class would have been permitted to keep $85 million of that $100 million, again, without any evidence that that's indeed what took place, that it was a dollar-for-dollar tradeoff. It certainly makes sense to me. It seems reasonable that Zurich, having agreed to pay no more than $100 million, would have agreed to pay $85 million to the class if class counsel had taken a reasonable fee in this case. No, Your Honor. No, given the current state of the settlement agreement, there would not be a basis for that, given that the objectives were not able to prove that there had been any such tradeoff. Well, it would appropriately compensate class counsel and appropriately sanction them for overreaching and demanding an excessive fee. Well, Your Honor, as I said, my clients would probably, they could file a motion. Right. Well, Your Honor, their theory is that if the fee had been reasonable, they would be receiving more. I understand that, but I'm talking about now. Now, there is probably no mechanism to recover any money that would then be paid back to Zurich. So there is no... Well, the question then is this. Do you really have an interest in the argument, then? In other words, you have to come to court with the ability that if you win the case, you get something from it. And otherwise, you don't have standing to challenge it. Now, what do you get from the victory here? Well, Your Honor, that position that you just stated has found some traction in the Ninth Circuit. I think we have a case out there called Knisley. I forget what the defendant is. But in that case, the Ninth Circuit did hold that someone who does not have a claim that would be increased by a reduction in the attorney's fee does not have standing. But that has never been the position of this court. Has the Ninth Circuit ever ruled contrary to that? I mean, has it ever come up? I mean, I'm startled. Frankly, I used to practice law. I had little clients. I was in Cape May, New Jersey. I had big clients. Just little people. And none of them would have ever laid out a five-cent piece for something if there wasn't something in it for them. So the question is, is that the basis for this court to give a ruling? Well, Your Honor, the fee objection was made in conjunction with the objection to the allocation. I understand that. That's a different issue. I'm just talking about this. You're talking about the settlement fee, though, aren't you? Right. My clients, because they took the position that the settlement wasn't worth what the class counsel was alleging it was worth, felt that the fee should also be commensurate with that and the class counsel should indeed be penalized for having negotiated a settlement that really gave away the class's money. So while they will not benefit financially from the result they seek here, I believe a majority of circuit courts in this country have always held that any class member has standing to challenge fees, whether or not they have a financial or pecuniary interest in the reduction of the fee or not. And Knisley is the only case that I've encountered where a circuit held differently. Was this point raised or is this just developing now on the basis of the argument? Which point, Your Honor? The point that, well, do you have standing? Was it raised in the appeal? There's so many briefs here that it's hard to… The appellees never raised lack of standing as a defense to the appeal, and therefore we did not rebut it in our brief. Yeah, but the appellees also don't oppose or are taking a neutral position on this question of attorney's fees. Are they not? They are or are not. Aren't they taking a neutral position? We'll hear from Mr. Clovis in a minute, but I… That's my understanding, that their position is neutral. Well, that's good news, Your Honor, because I assumed that they would… Who's arguing for the attorney's fees, the attorneys? Class counsel will be, yes, and I believe they do oppose my appeal of the fees. Well, the question is, did they raise that issue? No, they did not raise standing, and that is because I believe it's generally been the rule of this circuit that anyone has a right to object to fees and that anyone has a right to appeal from a denial of that objection. There is no requirement in the settlement notice that one, for example, file a claim in order to preserve a fee objection or have the right to appeal it. So that is something that… that issue of lack of standing has not been raised in this case. And I believe I've covered all of my points, so thank you very much. Mr. Pence, thank you. Any further questions? Thank you very much. Thank you. Mr. Clovis? Am I pronouncing it correctly? Clovis. Good. Thank you, Your Honor. Good morning, Your Honors. Good morning. May it please the Court. My name is Brian Clovis, and I'm here today on behalf of the plaintiff, Appleese, with respect to the two settlements that were approved by Judge Brown, as well as the fee… the two fee orders also approved by Judge Brown. I want to pick up on Judge Greenberg's remarks toward the end of Mr. Pence's fee argument. It's true that we didn't technically make an argument that his client, for example, doesn't have standing to challenge the amount of the fee because they don't have an interest in it, because if it's excessive, if it's found to be too much, the excess would go back directly to the defendant, and the absent class member would have no skin in that game. There's no interest there. That's true. There's a theme. I just want to sort of start with kind of a general principle, and I think Your Honors have picked up on this. And it's a little troubling, frankly, I'll be honest. There's a theme throughout the objectors' briefs that you scratch your head when you read their papers because almost all of their arguments are directly against the interests of their clients. Their clients are absent class members. Their clients would benefit from the settlements. And normally when you have a class action and objectors and objectors appeal, they're arguing things like you didn't settle for enough money. There should be more there. The notice was defective. We didn't understand what rights we were giving up by virtue of the release and participating in the settlement. Not so here. Here the arguments are to the extent we can glean what they're sort of targeting, things more like these claims in this case are not cognizable. You have problems with standing and filed rate doctrine, and there's no injury here. You can't ever prove injury. Your RICO claims are without basis. These are not normally the arguments that absent settlement class members make. I follow that, but what about the argument of the misallocation? It seems to me they have a plausible argument here, that first they're saying that the district court did not properly scrutinize the allocation. Second, they relied on experts from one side. I don't know whether there were any expert reports on the other side. I'm not aware of it, but maybe you can tell me whether there were. And finally, the conflicts were so evident that subclasses should have been appointed by the district court. So if they're right on that, at least they're asserting an interest on behalf of at least their claimants, which they put in group one of the excess. Your Honor, I think you're right to identify the, as far as I can tell, are the only argument that any of the objectors makes that you would expect them to make. That's the only argument where you could conclude as a result of, if they were to succeed on that, their clients may, may, I'll tell you why may in a minute, may do better under their proposed reallocation than under the actual allocation that was approved by Judge Brown. By the way, no experts, no profit, no discovery sought by the objectors on allocation. Instead, what did we have? We had not only experts that we had retained and were using in the litigation as our damages experts, but we also were working with the experts that were retained by 10 state attorney generals and 15 state departments of insurance. So there was a coming together of a group of experts and an extensive analysis of the realities of these various lines of business, the realities of, you know, the way Zurich on the one hand and Gallagher on the other, because we're talking about two settlements, Gallagher receiving, Zurich paying contingent commissions and how those dollars flowed through to increase premium and therefore how is it that we can fairly allocate the monies that were distributed. Now, obviously, most of the money, this is sort of economics 101, I guess, in this case, is going to be allocated to those who dealt directly with Zurich. They're the most directly impacted. In fact, of that group, it's the excess casualty. Why? I understand that, but why do you – what's the reason for that as opposed to the other categories? Right. You have the ones that dealt directly with Zurich, and then you have the ones that dealt directly with Zurich that went to one of the defendant brokers, and then you have what we'll call the non-umbrella really, sort of not the right term for us, conspiracy claimants, essentially ones that didn't have any connection with respect to Zurich. However, it's all throughout the litigation class record. We've shown throughout the two years of litigation, three years of litigation that we participated in, that the contingent commissions essentially flowed through and increased premium across entire lines of business. However, those are – the percentage increases when you get down the line are going to be less than the ones that a Zurich policyholder would have suffered by virtue of Zurich's particular participation in the conspiracy. So there's a difference. If it may please the Court, Jim Donahue is prepared to deal with the allocation issue head on and the conflicts, and he's ready to do that. I wanted to pick up on something else, the waiver. One of your honors raised the waiver question, and that's where I actually wanted to start. Here's what actually happened. It's true. Van Enterprises, which is really – by the way, Van Enterprises, with respect to the Zurich and the Gallagher settlement, they're the only one challenging settlement claims. They're the only one raising Rule 23 arguments on appeal. They filed an objection during the period for objections with respect to the Zurich settlement. The objections, as Judge Brown correctly recognized, were essentially absent any cogent, supported, reasoned analysis whatsoever. No case law, no arguments as to why Rule 23 wasn't satisfied. Instead, what they offered up was essentially a laundry list of talismanic words, typicality, adequacy, numerosity, predominance, superiority. No discussion about how it was that those weren't satisfied, just that they weren't satisfied. Does a court, though, just like a court obviously has to raise standing because it's jurisdictional and there's no case in controversy if there's no standing, doesn't a court also have to raise the question of the sufficiency of the class on its own, even if nobody said anything? It's a little different than just private litigation. You know, someone didn't plead the statute of limitations or something like that. I think the court does. I think the court has an absolute obligation to the absent class members and to the court itself, to the system, to ensure that Rule 23 has been satisfied. And I think there's no question if you look at Judge Brown's class certification decisions, settlement class certification decisions, he's done that in ample ways. But what happened here is now we're on appeal and now we're hearing all these arguments. By the way, I'll explain why in a second, for the very first time. To us, that is an absolute waiver. Why is that for the first time? Well, their objections were scant. Indeed, in addition to just simply saying the magic words of Rule 23 without telling why they were important here and how they applied, they also attempted to incorporate by reference simply, again, using magic language, we incorporate by reference the entire litigation class record that was before Judge Brown. Without any more. They also attempted to incorporate by reference, without doing any legal work or analysis, the entire motion to dismiss record that had been before Judge Hochberg initially and then Judge Brown. Fast forward. That's all they did. That's it. End of story. Fast forward to the opportunity to put in a final approval brief in opposition to the brief that we filed, the brief that the State Attorney General filed, and the briefs that the settling party, in this case, Zurich, filed. Silence. No briefs. Nothing. Fast forward to the fairness hearing. Opportunity to be heard. A lot of the objectors appeared and presented their arguments. I think Mr. Pence was among them. Was Van Enterprises? No. Not only were they not at the Zurich fairness hearing, they weren't at the Gallagher fairness hearing either. And not only didn't they put in a brief in the Zurich process, they didn't put in a brief in the Gallagher process either. And by the way, they were the only objector, at least that is ultimately appealing, they're the only objector for Gallagher or to the Gallagher settlement. No brief. No appearance at the fairness argument. And so, Judge Greenberg, I think I would say this. At some point, it is absolutely incumbent on the Court to ensure and to analyze that Rule 23 has been satisfied for settlement purposes. However, there is a process that's been developed, that's been set up, to ensure that there's abundant information provided by the various interested groups so that the Court, like all proceedings in district court, can make a reasonably informed, complete decision and can address and resolve and, in this case, I'd say dispose of, but at least have an opportunity to deal with these arguments rather than allowing objectors to abuse, I think, at some point the resources of this Court and the district court by raising these things for the first time on appeal. As a policy matter, I just think it's absolutely at odds with the way this really effective system has been set up, and I don't think it should be condoned. There's plenty of cases we have to support this argument, one of which actually is in the class objection context directly, it's a Second Circuit case. It's the Walmart versus Visa MasterCard case in which I was actually, or our firm was actually one of the primary counsel in that case. And looking at the record, at least as to the Gallagher settlement, when you look at predominance, didn't the district court confuse commonality and predominance in its scant support for the class certification? I don't think so, and here's why. I think that when Judge Brown throughout the decision recognized that in this case there are a number of things, a number of features of the case, of the allegations of the case, of the claims of the case, that are perfectly situated for a finding of predominance. One, there's a common scheme among all the defendants that isn't different for any particular plaintiffs. Two, the focus of the entire litigation is on the defendant's conduct, not the plaintiff's conduct. Three, the nature of the conspiracy here is one unified set of behavior with very well-organized scheme, as we allege. And we're going to hear about that more later today with respect to dismissal arguments. But I think that if you look at, for example, Prudential, Judge Sirica's decision in Prudential, there are no more compelling facts there than here about there being a sort of cohesive, common scheme among the defendants that don't raise the kinds of individual issues like a case like AMCAM would raise, where you're dealing with problems of exposure and different workplace environments, what kind of health conditions you brought to the work site, those sorts of individualized personal injuries slash, you know, I guess injury-type cases or cases where, you know, like, for example, Newton, where it's a litigation class case but still sort of applicable here, I think, where you've got claims and complaints about the way in which brokers are placing trades on behalf of their customers using different systems, or the claim is they should have used the best system possible. The problem is the class was all over the place. For some of them, they used the best system that got people the best price. For others, they used a different system that resulted in them getting a worse price. And one of the problems there is there was antagonism between the plaintiffs. There are tons of individual issues in that case about injury. You know, in Warfarin Sodium, for example, that's another case where predominance resulting from a common scheme, an antitrust price-fixing case like ours, an antitrust Sherman Act case involving market allocation there, price-fixing, fits nicely as this Court has often held, as the Supreme Court has held, where there's a common scheme, these antitrust cases, consumer cases where you're focused on the defendant's conduct play well. Now, someone mentioned hydrogen peroxide. I feel obligated since two of your honors were on that panel, one of you wrote the decision, to at least address that briefly. I have to be honest. I can't. I've read it probably, you know, ten times now. I can't think of a case that I've seen on litigation class certification that is less applicable to the analysis here on settlement class certification. As I read that decision, it is almost entirely about the need to identify and assure the Court for trial that there are common ways to establish core claims in the case, required elements in the case. In hydrogen peroxide, antitrust impact. Obviously, at some level, there's sort of a coming together of predominance and manageability. I think that case may present an example of one where most of the decision is about concerns that would exist at trial, concerns that would exist regarding trial plans, the sufficiency of trial plans, and whether or not, you know, there's going to be a way to try this case as a class case without it coming undone and being completely essentially unmanageable. And in our case, it couldn't be more different. It couldn't be more different than AMCAM. I mean, this is a case where, in our view, and I think Judge Brown obviously agrees, at least for purposes of settlement class certification, there's enough cohesion, right? It wouldn't be unfair here. It's not unfair here for the named plaintiffs to act on behalf of the settlement class members and settle their claims because their interests are directly aligned. And when the coming together of adequacy and predominance here, I think Judge Brown got it just right, and I think his decision is fully consistent with the case law in this circuit on settlement class certification, which I think is, I think Your Honor asked first right out of the box about the differences between settlement class certification. There's no question. I mean, yes, the same elements apply except for manageability, but they're simply different considerations and different concerns when you have cases that are settled for which there's no need to go to trial. There's no need to have a battle of the experts to determine whether or not there's a common way to establish impact, for example, as in hydrogen peroxide, right? Was there – I can't remember. Was notice challenged by the objectors here? There were notice challenges by the objectors, but they've abandoned them presumably on appeal. Okay. Thank you. In any event, direct mail was sent to the $3 million. For the Zurich settlement, it was direct mail to about $3.9 million, direct Zurich insured and former insureds. For Gallagher, it was about $290,000, and then there was widespread publication notice, two iterations in each of the Wall Street Journal, the New York Times, the USA Today, and one time in the largest newspaper in each of the 50 states. Also, notices were published in a variety of trade, insurance trade publications. That was a notice from which Judge Brown thought was very aggressive and certainly complied with our requirements. I don't want to push this too far, but I did bring with me a quote from a recent case, if I can find it, where there were objectors and they were objecting. They were actually trying to collect a fee in exchange for their – or in consideration for their objections that were made to a fee award. The fee award was ultimately reduced, but it was reduced, as made clear by the court, because of other objections by state AGs, not by these particular professional objectors. And it's the Inouye Cardinal Health Securities litigation. It's a recent case, Southern District of Ohio from 2008. And by the way, one of the reasons this case is particularly interesting, I think, is because two of our objectors here were also two of the objectors in this case. And confronted with their fee request, here's what the court said. I'm just going to read it. It would be, quote, Yet class actions also attract those in the legal profession who subsist primarily off of the skill and labor of, to say nothing of, the risk formed by more capable attorneys. These are the opportunistic objectors. Although they contribute nothing to the class, they object to the settlement, thereby obstructing payment to lead counsel or the class, in a hope that lead plaintiff will pay them to go away. Unfortunately, the class action kingdom has seen a Malthusian explosion of these opportunistic objectors, which now seem to accompany every major class litigation. By the way, that judge in that court, not alone. If you look at the O'Keefe case from the Eastern District of Pennsylvania, 214 FRD at 266, the judge there said the federal courts are becoming increasingly wary of professional objectors. This problem has persisted for a number of years. I think it's just beginning, unfortunately, to be recognized for what it is. When you have counsel representing clients in a settlement class who are benefited significantly by virtue of the work that was done to get that settlement in, and that's under that settlement, and their arguments are all about defeating, destroying the settlement. I think it might have been you, Judge Greenberg, talking about these arguments, if they're carried through, and maybe Judge Shorrock as well, you're going to be left with nothing. If there's no class, and they are arguing, by the way, that there can never be a class here. There's no question about it. Litigation or settlement class, so they'd be out in the cold, their clients. They are arguing that these claims in this case, they're not viable. This case, yet instead of opting out and electing to pursue their own rights, instead they chose to stay in to the detriment of their own clients. Now, I'm not going to say what the objectives are, but I'm not optimistic. I can turn to the fees issues now, if you like. I mean, I had a little bit prepared on final approval, but I think we seem to be sort of beyond going through the standards and things like that, unless you'd like me to. Let's hear you on attorney's fees. Okay. My first point on attorney's fees would be that while the construct of the fee award and the fee request and the way it's designed within each of the settlements, I mean, obviously, we negotiated fees after the settlement was fully, finally negotiated. So that's a requirement. We easily, amply complied with that. While the two attorney fee provisions in the two settlement agreements are very, very similar, if not identical, not a single objector in Gallagher objected to fees. Van Enterprises is the only objector that's on appeal here in Gallagher that didn't object to the fees. The only fee objection is in Zurich, so I'll talk about Zurich. The standard, obviously, for fee approval in a class case, clear abuse of discretion. And in this circuit, courts have given great deference to the district judge's findings regarding awards of attorney's fees and expenses. So for the numbers here, I mean, obviously, we're in a percentage-of-the-fund jurisdiction with a lodestar multiplier sort of cross-checked to judge the reasonableness of the percentage. Here, the fee and expense award out of Zurich, that's all we're really talking about now, is $29.95 million. The defendant had agreed in some agreement to pay up to that amount. It's not coming out of the fund. It's separate and apart from the fund. What about their argument about the similarity in dollars between the amount that's paid and the amounts that was transferred over to the multistate or to the three-state agreement? They're arguing that it's more than just coincidence. I can't begin to know what the three-state attorney generals are thinking when they're negotiating additional settlement value for those that they represent. But what I can talk about is the sequence of events that led to the settlement and the fees. So Mr. Pence talked quite a bit about the MOU. The MOU was entered into in October of 2005. October 2005 is about a year, a full year, after a number of us filed our first cases in this realm. So there was a year that went by before the MOU was entered into. In addition to that, the NBRL proceeding was organized in, I believe it was in the spring of 2005. And we got going with discovery pretty quickly. So I'd venture to say, although I don't know for certainty, that we're talking about probably at least three or four months of discovery, document discovery at the outset. In addition to a lot of back and forth on meeting and conferring and all those things that would have to be done for all the defendants. Now, one of the arguments they make is, well, stop the clock. Once the MOU is entered, that's the end of it. You should cut their fee off as soon as the MOU is entered. That makes absolutely no sense if you understand the nature of the litigation the way it proceeded. We entered into the MOU. It wasn't until nine months later that we actually entered into a settlement agreement with Zurich, a binding, executed settlement agreement. During the course of the period from the entry of the MOU to the entry and execution of the settlement agreement, I would say, I think it's in the briefs, I would say we probably reviewed 30 million pages of documents, deposed at least 90 witnesses, and engaged in, I would say, no fewer than 25 or 30 meet and confers with all defense counsel to hammer out all the discovery issues that exist at the beginning of cases. Now, why is that important? Because Zurich was in the MOU. They didn't have to, they weren't participating in discovery after the MOU. I'll tell you why it's important. This is a conspiracy case. And just because Zurich, we're not taking a Zurich deposition, by no means means that we're not totally focused in on Zurich's role in everything that happened in the conspiracy, how they fit in, and trying to better understand exactly how this thing worked. We took discovery of every defendant during that period, and our focus was trained not just on those but also on Zurich. You know, that was our opportunity to, most of it anyway, to flesh out the allegations of the complaint and get the discovery that we needed. And the second point is, an MOU is an MOU. We had no settlement agreement yet.  In fact, the MOU had to be extended three separate times because of continuing negotiations. And I participated in negotiations. There were many instances where it appeared as though our deal may come undone. And so lots of work, much of it relating to Zurich, among the other 25 defendant groups. They were a big player in the conspiracy in the case. So to say that, you know, stop the clock when the MOU was entered absolutely ignores the reality of how we litigated the case, being a conspiracy case. So does that answer the question that you raised? I want to be complete. It probably doesn't answer the question about the 29 million similarity. Okay, let me get to that next. So fast forward from the MOU to March approximately the following year, 06. Zurich negotiates and enters into this agreement with the three state attorney generals, including New York. A short period later, they enter into an agreement with the multi-state attorneys general and the 15 states' departments of insurance. By the way, the 15 state department of insurance settlement agreement and settlement, that was something that in our MOU we were obligated to help them broker, and we did. We worked hard traveling around the country with Zurich to meet with many of the state AGs to help broker that settlement. So when they negotiated $51.7 million in March on behalf of the settlement class, because that's where all the money was going to, and that wasn't going to the states themselves, it was going to the settlement class, into the MDL, part of this settlement fund that we created with the first $100 million out of the MOU, that's where that money was going. And we helped precipitate that. We were an instrumental part of that process. The declaration of Betsy Sanza, counsel for Zurich, that was submitted with, I believe, our fee petition in Zurich, makes that point abundantly clear. I'd recommend reading that if you have any questions about that. With respect to the $29.95 million, again, that money earmarked originally for the class is continuing to be earmarked for the class. The fact that the New York Attorney General is taking credit for using it to fund its settlement doesn't take away at all from the fact that the people that are going to benefit from that $29.95 million are settlement class members in our case. Now, if they elect to participate and enjoy the benefit of that $29.95 million, they won't be settlement class members anymore, but they were when this was all negotiated. All of these people, so in other words, one way to look at this, and we didn't do this. We used $100 million. We didn't use $121 million, which Judge Brown mentioned at one point, nor did we use $151.7 million. I think we could have, and I think we could have done it credibly. What did we do instead? We ratcheted back to the original $100 from the MOU. That's what we secured. That's what we're delivering. And I think we can argue that we're delivering at least $121 million in conjunction with the state AGs that we're working with who are cooperating with us on the settlement, and they're partnering with us. But we used $100. We wanted to be conservative. Mr. Klobuchar, thank you very much. Thank you. Mr. Donohue. Good morning. May I please escort? My name is James Donohue. I'm here on behalf of the College of Pennsylvania and the other states, the other intervener states in this matter. I'm with me here also in the first row is Tim VanWinkle from the Texas Attorney General's Office, who did a lot of the work in the court below. I'd like to talk about three things here today. One is why are the attorney generals here, what we did, and why this case does not require subclasses and there's no problem with the plan of allocation. First, why we're here. There's three reasons why we're here. As you've heard, the memorandum of understanding negotiated between the class and Zurich required that the attorney generals and the insurance commissioners which had pending investigations of Zurich's conduct and the other insurers' conduct in this case be resolved. Secondly, the attorney generals are the chief law enforcement officers of their states, and they have an interest in ensuring that the wrongful conduct that was alleged in this case didn't happen again and there was some process put in place to prevent it from happening. Thirdly, the attorney generals of each of the states represent their state agencies or their governmental entities. In Pennsylvania, under the Pennsylvania Commonwealth Attorneys Act, Pennsylvania represents state agencies. Some of the other states in our group have a broader mandate. Florida, Maryland, and Oregon, for example, represent not only state agencies, but they also represent municipalities and the other governmental entities within their states. The reason I bring that up is that sort of goes to the whole process of how we got here and why this is structured the way it is. Governmental entities purchase liability insurance for those things for which they don't have sovereign immunity. Governmental entities do not dominate the purchase of insurance. I think the IAD objectors have accused us of appropriating 70 percent of the fund for our clients. The governmental purchasers as a total purchasers of all of the purchasers of the liability insurance are really a small, a very small portion of that. To give you an example, in Pennsylvania, our total premiums during the four years were different types of liability insurance products. At the state level, I'm not talking about municipalities because we don't represent them here, was only $7 million. So we're not a dominant force in this market. We haven't hijacked all the money for our clients. We purchase liability insurance the same way everybody else does. We go to a broker, and in these cases, these brokers have these incentives to steer people to particular insurers, which we allege were unlawful. The other thing that's important to know is we wanted to – we didn't have to participate in the class. Typically, you know, if you look at a lot of class actions, they exempt governmental entities. Because among ourselves, we had different groups represented. Some states represented municipalities, others couldn't. We decided the most effective way to treat everybody equally was to put our claims, to put our clients into the class and have them treated that way. You know, we didn't want the city of Philadelphia being treated differently than the city of Portland, which would be represented by their attorney general. That's what we were trying to accomplish. Now, what did we do? In the fall of 2004, we became aware, as everybody did, of the New York Attorney General's investigation into the allegations of these payments of contingent commissions in order to allocate customers for different types of liability insurance. A group of states had begun an investigation. We issued subpoenas to all the major players, including Xerox. We had begun collecting data, and we're reviewing that data. We became aware in the fall of 2005 when Xerox and the privates came to the states and said, we've worked out this deal, and it's $400 million. Here's the memorandum of understanding. At the same time, we were aware the New York Attorney General's office had entered into some settlements at that point. We had had some limited discussions with them, and what they were doing was they were basically taking a percentage premium and making the insurers pay that back. We weren't sure that percentage of premium had any basis on sort of what the exposure was for the insurance company, nor were we really sure $100 million really had any relationship to the exposure. Now, Xerox and the privates presented a very complicated formula as to how they got there, but we weren't sure. So we had our own economic team go and look at this. And what they did is they looked at the different levels of commissions, and they traced through this process to see what we estimate the damage amount was. What we found was that with the increase in commission commissions, that increase was passed on as a multiple in the form of higher premiums. And the multiple was – that multiple formed the basis for the additional $51 million. Our conclusion was the appropriate number in this case should be $151.7 million. So that's how we got to where we are. Now, one of the things that the objectors do is say there really should be two classes here. Now, the case law doesn't really support that because there's not really two classes here. What we're talking about is the purchase of liability insurance. And people purchase liability insurance in tiers. Their first tier is the primary level of liability insurance, which goes up to a couple million dollars. Then there's excess liability insurance that's purchased on top of that. Every Zurich excess liability customer is a primary liability customer too. This is a case where – Primary liability customer with Zurich? Well, they could be with Zurich or they could be with somebody else. You know, there's not – it's a requirement that you – or it's generally a requirement. The excess liability carrier is going to look as if you've got primary coverage. It may be with that same company. It may be with another company. You know, it depends. So in the other cases, if you look at the other cases where the court has said you've got competing interests, if you go to Anchem where you have the asbestos victims who have the disease versus the asbestos victims who might – who've merely encountered asbestos. Or if you look at the – there's another case in the Second Circuit involving a pharmacy benefit manager. That's Central States versus Medco. If you look at that case, you have people who are covered by fully insured PBMs versus people who are in self-paid PBMs. That's not the distinction here. Here you have everybody who's buying liability insurance. They're going out – they're going to a broker and they're bidding quotes and they're buying, you know, a primary coverage and they're buying excess coverage. Now, some people who buy primary coverage, that's all they buy. They don't buy excess coverage. But there are tons of class actions where the people who buy more of a product are paid more. That's – you know, there's nothing different between this case and all those other cases which have awarded more money based on the fact that people have purchased more of a product. So the idea that there needs to be subclasses here, and this is somehow like those cases where there's different people purchasing different things, is misplaced. One of the things that we did is we fought very vigorously because we looked very carefully which types of policies had the highest contingent commissions, which types of policies had the highest inflation in the premium, and most of that was on the excess commission side. Most of the contingent commissions were paid on the excess insurance side. So we fought with everybody to ensure that the payout here reflected what actually happened in the marketplace. And that's how we arrived at, you know, at sort of the basic scheme here. On the plan of allocation, really what the objectors' objections come down to is, you know, the percentage should be a little bit different. But that – you know, the standard here to undo this type of settlement is abuse of discretion. And to say that you're going to move, you know, the percentage from 51.1 percent to 49 or 43 or whatever they want to do, that's not – they haven't shown an abuse of discretion here in the different levels of – Well, they – I take that point. But as I understand their principal argument is that there's a conflict between these groups as they have identified these particular groups. And you're saying that there is no conflict at all here. And as I get – and I think the second thing that they're saying is that the court impermissibly relied on your experts. And yet, as I understand it, they had no experts of their own. Is that accurate? They had no experts of their own, and they've never asked us for any, you know, information about what our experts did. We would – you know, we spent a tremendous amount of money, you know, doing this expert work. We shared that expert work with the Zurich and the privates in the context of the settlement negotiations. But they've never asked to see what our expert work was or how comprehensive it was. They've never asked for that information. And were the expert reports presented to the court? No, they were not presented to the court. The fact that we had – that we had based our – the damage amount and the allocation, that was presented to the court. But the expert reports were not presented to the court. Was the issue ever joined before the district court that your – the basis for your allocation, the foundation being your expert reports, was incorrect? Or did the objectors ever come in and say, don't rely on these expert reports? The experts – they cited – they didn't, you know, criticize our reports. What they did is they cited this report that had been filed in the context of the motion to dismiss. You know, that's what they cited. They didn't, you know, cite to the fact that – they didn't try to contest our report in the court below or what we had done in the court below. Yeah, I see the red light is here. Just one sort of final thing here is that a lot of what they want to do here is look at this case now. You know, we settled this case in – we actually began the discussions in the fall of 2005 when there was a broad class that was out there. It hadn't been certified yet. Before there had been – before the motions to dismiss had been decided, before Tuomaly came down, which changed the pleading standards, you know, if you want to look at the case, you know, maybe the case would be resolved differently today. But the case that was resolved, we think we got a fair and adequate settlement. We got a tremendous amount of money. And we think that if it's – the money would be appropriately distributed to people who were harmed. Thank you very much. Any other questions? Thank you, Mr. Dunn. Mr. Larkin. Good morning. Good morning, Your Honors. May it please the Court, I'm Edwin Larkin with Winston & Strachan. On behalf of settlement appellee Arthur J. Gallagher, I was going to begin today by running through the various benefits of the Gallagher settlement. But before I did that, I wanted to pick up on something that Judge Sirica pointed out in the beginning of this argument when Mr. Brashman was talking about the plan of allocation. Judge Sirica, you pointed out that if Mr. Brashman and Van Enterprises were correct in their argument that the settlement ought to be overturned, that they would, in fact, take nothing. Indeed, the problem for Van Enterprises is even worse than that, because if you look at their argument with respect to the plan of allocation, what they say is that the direct commercial claimants get too much of the settlement pie. The problem with that is that Van Enterprises is a direct commercial claimant itself. And so if it's successful in its argument, it then would take less under the settlement, under some revised plan of allocation than it would if the settlement and plan of allocation were to stand as it does. With respect to their challenge to the plan of allocation, they offered no reason why the disparate treatment between the various categories of class claimants failed to identify how the disparate treatment or the different allocations harmed the various class members. They simply say that it's different, and because it's different, it's improper. But the question is whether the plan of allocation is fair, reasonable, and adequate. It was done over a year's negotiation at arm's length. There was significant discovery. Over 70 million pages of documents were reviewed. 104 million pages were from Gallagher itself, and a minor, minuscule fraction of claimants objected or opted out. There were only two objections. Only one, which is where we're before the court, was pursued, and only 206 claimants opted out. There's resounding acceptance of this settlement by the potential settlement class members. The description of the settlement, the benefits of the settlement, are that the class members divide among six different claimant categories, $28 million. There is also non-monetary benefits. Gallagher has agreed not to take contingent commissions. They agreed to no bid rigging. They agreed to no pay-to-play arrangements. They agreed to no reinsurance leveraging, and they agreed to no inappropriate use of wholesalers. In other words, there's more than just the money in this case. There are non-monetary benefits. Again, it's fair, reasonable, and adequate. I don't believe that Van has demonstrated that Judge Brown abused his discretion in approving the settlement. Unless there are any questions, I'll finish. Good. Thank you, Mr. Larkin. Thank you very much. Mr. Bashman. Thank you, Chief Judge Chiricka. I'd like to begin my rebuttal argument where I began my original argument, which is that the district court here applied the wrong legal standard in analyzing the class certification question. Both Amkin from the U.S. Supreme Court and Prudential say that the question of predominance requires even closer scrutiny for cases to be settled at the time of class certification than it would receive in a litigation class. What we've heard from class counsel today is that this court's predominance decision in hydrogen peroxide just doesn't apply to settlement because it wasn't a settlement case. But that goes against both Amkin and Prudential. And the reason they have to continue to refrain that it doesn't apply, and they also say that the Danvers case, which also two members of this panel sat on, does not apply because that was a litigation class. But it does apply under Amkin. And if it does apply, they have no way to distinguish it or say that they satisfy it. And as a result, the classes that were certified here should not have been certified. What we're seeking for Van Enterprises is the best possible settlement, a settlement that benefits a class where 40 percent of all class members were benefited by the challenge practice is not a settlement that's good for my client, which was actually injured by the challenge practice. Unless this court is willing to allow a double standard for settlement classes, that's different from the certification requirements with regard to predominance for litigation classes,